UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHAQUAN KELLY #792018,                          Case No.   2:20-cv-00049

        Plaintiff,                            Hon.   Paul L. Maloney
                                                U.S. District Judge

   v.

UNKNOWN LABELLE, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses a summary judgment motion filed by Defendant LaBelle.   (ECF No. 53.)

The Plaintiff in this case – state prisoner Shaquan Kelly – filed this civil rights action pursuant to 42 U.S.C. § 1983.   He alleges that his rights were violated while he was confined at the Marquette Branch Prison (MBP) and was housed in a Level V segregation unit.   (ECF No. 1.)   Kelly's verified complaint alleged that he was assaulted by Corrections Officer (CO) LaBelle.

On June 18, 2020, this Court entered an opinion and order dismissing all Defendants and all claims except for the Eighth Amendment excessive force and retaliation claims against CO LaBelle.   (ECF Nos. 4 and 5.)

CO LaBelle has filed two motions for summary judgment on the issue of exhaustion.   (ECF Nos. 17, 36.)   The undersigned issued two R&Rs regarding these motions.   (ECF Nos. 23, 41.)   In its ruling on the first motion, the Court dismissed

Kelly's claims for monetary damages against CO LaBelle in his official capacity. (ECF No. 40.)   And in ruling on the second motion for summary judgment, the court dismissed Kelly's retaliation claim against LaBelle for issuing a misconduct ticket. (ECF No. 44.)   As a result, the two remaining claims against LaBelle are (1) Kelly's Eighth Amendment excessive force claim, and (2) Kelly's First Amendment retaliation claim relating to a pat-down search conducted by Labelle and an assault.

Discovery ended on May 24, 2022.   After discovery ended, CO LaBelle filed a motion for summary judgment based on the merits of the case.   LaBelle included videos of the alleged incident that were shot by MDOC employees.   (ECF Nos. 51, 54-8, 56.)   Kelly failed to file a response.   In the opinion of the undersigned, the videos of the incident do not show that Kelly sustained any injury or that the force used by CO LaBelle was excessive.   Instead, the videos confirm CO LaBelle's version of the event – that Kelly refused to return to his cell when ordered and instead turned toward CO LaBelle.   Furthermore, the videos confirm that Kelley was verbally aggressive towards CO LaBelle.   Accordingly, the undersigned concludes that CO LaBelle has met the Rule 56 standard and is entitled to jument in his favor.

It is respectfully recommended that the Court grant CO LaBelle's motion for summary judgment and dismiss this case.

## II.  Factual Allegations

On December 15, 2019, while Kelly was confined in belly chains and handcuffs, CO LaBelle told Kelly he needed to shake him down.   (ECF No. 1, PageID.5.)   Kelly says that his family had been making complaints to someone in Lansing, Michigan,

2

about LaBelle and other officers.    (*Id.*)    Kelly asserted that he did not want LaBelle to touch him due to a fear of assault.    (*Id.*)    Kelly says that he turned to CO Mayer to ask if he would conduct the shakedown.    (*Id.*)    At that point, Kelly says that LaBelle punched him in face and yelled stop resisting.    (*Id.*)    Kelly says that one of his dreadlocks was pulled out causing him to bleed and experience pain.    (*Id.*)    Kelly says that he never resisted and was defenseless and in chains during the entire incident.    (*Id.*)    Kelly says that the video will show that he was assaulted.    (*Id.*, PageID.6.)

### III.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).    The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."    *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.    Eighth Amendment – Excessive Force

The Eighth Amendment limits the power of the states to punish those convicted of a crime.   Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency."   *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain."   *Id*. at 346.   Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification."   *Id*.

To establish an Eighth Amendment claim, Plaintiff must satisfy both an objective and subjective component.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).   "The subjective component focuses on the state of mind of the prison officials."   *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011).   "The objective component requires the pain inflicted to be 'sufficiently serious.'"   *Williams*, 631 F.3d at 383 (quoting *Wilson*, 501 U.S. at 298).

Under the subjective component, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   *Hudson v. McMillian*, 503 U.S. 1, 5-6 (1992).   The Court "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."   *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015).   In determining whether the use of force is malicious or sadistic, the Court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the

4

responsible officials," and any efforts made to temper the severity of the forceful response.  *Hudson*, 503 U.S. at 6-7.

Under the objective component, the pain inflicted must be "sufficiently serious." *Williams*, 631 F.3d at 383 (quoting *Wilson*, 501 U.S. at 298).  The Court's inquiry regarding the seriousness of the injury is "contextual" and is "responsive to contemporary standards of decency." *Hudson*, 503 U.S. at 8–9.  While the extent of an inmate's injury may help determine the amount of force used by the prison or jail official, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  When prison or jail officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated, "[w]hether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

To establish a genuine issue of material fact regarding the **objective component** of this claim, Kelly would need to establish that the pain he suffered was "sufficiently serious." *Williams*, 631 F.3d at 383.  Although the Court's inquiry regarding the seriousness of Kelly's injuries is contextual and the seriousness is not dispositive of his claim, the seriousness of the injuries reflects the amount of force that Kelly was subjected to when he was taken to the ground.

In addition to being punched in the head, Kelly asserts that one of his hairlocks was pulled out causing his head to bleed and causing him pain and suffering.  (ECF No. 1, PageID.5.)  Kelly stated that one of the officers, he did not know which one, "pulled out one of . . . my locks, one of my hair locks, pulled one of them out of my head, and LaBelle – LaBelle was laughing about it. . . ."  (ECF No. 54-4, PageID.317.)

After the incident Kelly was examined by Nurse Negrinelli.   (ECF No. 54-9 (affidavit of Nurse Negrinelli).)   (*Id*., PageID.392.)   She noted that Kelly said that one of his dreads had been pulled out.   She also "could see that Kelly was walking without problems, moving his neck, he was alert and oriented, and he did not appear to be in any acute physical distress."   (*Id*.)

The Critical Incident Report (CIR) associated with the altercation included a description of all injuries.   (ECF No. 54-7, PageID.370.)   Kelly complained that the COs pulled his hair and hurt his neck.   (*Id*.)   The CIR included the following description of Kelly's injuries and the treatment he received:

| Treatment Location | ☐ Scene of Injury | ☐ Health Care Services | ☐ Hospital/Off-Site | ☐ Other Eb7 |
|---|---|---|---|---|
| Description of Injuries and Treatment/Aid Administered      ☐ None Required      ☐ Prisoner Refused Medical Treatment ||||
| Prisoner Kelly #792018 was seen cell side in E-unit following an altercation with custody. When I initially asked him about his injuries, he stated "they pulled one of my dreads out." At that time he denied any other complaints. I saw him again at approximately 0830 per his request. Prisoner Kelly now complained on neck pain. He stated, "My shit's fucked up." He pointed to the left lateral area of his neck. He was standing at his cellfront at this time, and was also yelling at the CO, who was present. Due to Prisoner Kelly's level of agitation, no further assessment was done. Vital signs not obtained due to cell side exam. Prisoner was noted to be ambulating without difficulty, was moving his neck, and did not appear to be in any acute distress. He was alert and oriented x3. He was offered Tylenol or Motrin for pain, to which he replied, "Whatever," and walked away from his cell front. He will be listed to be seen by the medical provider for follow-up. ||||
| Name of MDOC Health Care Provider (Print) C. Negrinelli | Title RN 12 | Signature *Negrinelli* | Date 12/15/2019 ||

(*Id*.)

Thus, as a starting point, the medical evidence establishes that Kelly suffered no visible injuries, and that he walked away when he was offered pain medication.

But the more important piece of evidence before the Court are the video recordings of the altercation between Kelly and LaBelle.   The videos of the incident do not show that Kelly sustained any injury or that the force used by CO LaBelle was excessive.   The videos confirm CO LaBelle's version of the event – that Kelly refused to return to his cell when ordered and instead turned toward CO LaBelle.   In addition, after Kelly was restrained in a chair, he continued to speak by repeatedly

6

admitting that he assaulted CO LaBelle.   At several points during the videos, Kelly can be heard admitting that he was the aggressor.   Kelly stated "No I'm not gonna let you shake me down.   So when he grabbed me I flipped his fat ass."   (ECF No. 58 (handheld video at 4:03).)

Third, Kelly failed to submit credible evidence, medical or otherwise, showing that he suffered an injury from the alleged excessive force.   Without the benefit of verifying evidence regarding an injury and the cause of the injury, Kelly has failed to show a genuine issue of material fact regarding the seriousness of his injuries.

Despite Kelly's failure to establish a genuine issue of fact regarding the seriousness of his injuries, Kelly may still assert viable Eighth Amendment excessive force claims if he can show that Defendant applied force maliciously and sadistically to cause harm.   *Hudson*, 503 U.S. at 9.

The **subjective component** is satisfied when Defendant applies force "maliciously and sadistically to cause harm."   *Id.* at 5-6.   To conclude whether Defendants' applied force maliciously and sadistically, the undersigned analyzes the reasonableness of Defendants' use of force.   *Id.* at 6-7.   And reasonableness is determined by (1) the relationship between that need and the amount of force used, (2) the threat "reasonably perceived by the responsible officials," and (3) any efforts made to temper the severity of the forceful response.   *Hudson*, 503 U.S. at 6-7.

CO LaBelle asked Kelly if he wanted to go to the yard.   (ECF No. 54-2 (affidavit of CO LaBelle).)   As a Level V administrative segregation prisoner, the highest security level, Kelly could only go to the yard for one hour, five days per week.

(ECF No. 54-3, PageID.299 (MDOC Policy Directive 04.05.120 AA (21)).)    At this level, prisoners must be restrained anytime they are allowed out of their cells.    (*Id.*, PageID.290.)    Kelly indicated that he wanted to go to the yard, so CO LaBelle applied a belly chain and unlocked Kelly's cell door.    (ECF No. 54-2, PageID.290.) When Kelly started to come out his cell facing CO LaBelle, LaBelle ordered Kelly to turn around and come out his cell backward which is the common procedure.    (*Id.*) CO LaBelle ordered Kelly to comply with a shakedown and Kelly responded by stating he did not want LaBelle touching him.    (*Id.*)    CO LaBelle then ordered Kelly to return to his cell, but Kelly refused, turned toward CO LaBelle and began walking toward him stating "I'm not going back in my cell."    (*Id.*)    CO LaBelle says that he put his hand on Kelly's shoulder and with the help of CO Mayer brought Kelly to the glass cell-front.    (*Id.*)    Kelly resisted and CO LaBelle says that he directed CO Mayer to bring Kelly to the ground.    (*Id.*, PageID.291.)    Additional officers arrived on the scene, leg irons were applied, and Kelly was placed in a restraint chair.    (*Id.*)

CO Mayer's affidavit supports CO LaBelle's version of the event.    (ECF No. 54-5, PageID.322.)    CO LaBelle issued a Critical Incident Participant Report summarizing what took place:

I unlocked the cell door of E Unit Base Gallery Cell 7 to escort prisoner Kelly to yard. Prisoner Kelly attempted to come out of the cell facing staff. I directed prisoner Kelly to face forward and come out of his cell backwards. Prisoner Kelly complied with my order and came out of his cell backwards. Once we were out of the vestibule, I ordered the prisoner to comply with a shakedown. Prisoner Kelly pulled on the restraints and stated, "I don't want you fucking touching me." With a loud clear voice, I ordered prisoner Kelly to go back into his cell. The prisoner then turned facing me and started walking towards me stating "I'm not going back in my cell." I then placed my left hand on the prisoners left arm and my right arm on the on his left shoulder and placed him against the vestibule glass on E Unit Base 8. Officer Mayer assisted me in placing the prisoner on the vestibule glass. I then directed Officer Mayer to bring the prisoner to the ground. Together we placed prisoner Kelly on the ground. Prisoner Kelly was actively resisting staff while on the floor by pushing away from staff and attempting to gain his feet. I delivered (3) hammer fist strikes to prisoner Kelly's right common peroneal with my right hand. I was giving loud repetitive orders to "stop resisting". Prisoner Kelly continued to resist staff efforts to control him while on the floor and I delivered (3) knee strikes to prisoner Kelly's right common peroneal while giving loud repetitive orders to stop resisting. Prisoner Kelly continued to attempt to gain his feet and pulled away from staff control. Prisoner Kelly continued to not comply with staff orders while on the floor. I delivered (3) hammer fist strikes to prisoner Kelly's right and left femoral nerve while giving loud repetitive orders to "stop resisting". When additional staff arrived we were able to place prisoner Kelly over onto his stomach. I directed Officer Ganzel to go to post 6 and retrieve the leg irons. Officer Ganzel returned to the scene and placed the leg iron restraints on prisoner Kelly. I directed staff to roll the prisoner on to his buttocks. We assisted prisoner Kelly to his feet and placed him in the Emergency Restraint Chair. I controlled prisoner Kelly's head while he was in the in the emergency restraint chair. Officer Wagner and I escorted prisoner Kelly to the east wall in echo unit. I then went to the E Unit officers desk to retrieve a spit mask for prisoner Kelly. I then delivered the spit mask to Sgt. Leach and returned to the E Unit officers desk. I was directed to complete the rest of my shift in D Unit.

(ECF No. 54-6, PageID.330.)

The video evidence fails to support Kelly's claim of injury and excessive force, and instead provides support for Defendant's version of the event. There are two videos that depict the incident. (ECF No. 58.) The first video is a recording from a fixed security camera located outside of Kelly's cell. That video does not have sound. In that video, two officers are outside Kelly's cell. Kelly is observed coming out of his cell and he then turns toward the officer. Kelly is immediately taken to the ground and several other officers arrive at the scene.

The second video is footage from a handheld camera which shows Kelly secured in a chair. The video has sound and Kelly is speaking during the entire recording. Kelly repeatedly admits that he "flipped" LaBelle as soon as LaBelle touched him. Kelly complains that one of his dreadlocks was pulled. (*Id.* (handheld video at 2:32-2:39, 4:06-4:18.)

9

Neither of the videos show an injury to Kelly.   Kelly makes no statements indicating that he was injured or requesting medical assistance.   The videos do not support a finding that excessive force was used by CO LaBelle.   The videos do not support Kelly's claim of excessive force.   *See Scott v. Harris*, 550 U.S. 372, 380-381 (2007) (noting that a court should "view[] the facts in the light depicted by the videotape").   Kelly has failed to respond to Defendant LaBelle's motion.

In the opinion of the undersigned, Defendants have established that they did not violate Kelly's Eighth Amendment rights.

## V.   First Amendment – Retaliation

Kelly claims that CO LaBelle ordered a pat-down search and assaulted him because Kelly's family had made complaints about other officers and CO LaBelle. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.   *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*.

### a.  Protected Conduct

For purposes of this motion, Defendant concedes that the complaints made to "Lansing" by Kelly's family members qualify as protected conduct.  (ECF No. 54, PageID.279.)

### b.  Adverse Action

#### 1.  Pat-down search

LaBelle argues correctly that a routine pat-down search is not adverse action. Defendant cites *Yates v. Rogers*, No. 2:20-cv-180, 2018 WL 6629366, *6-7 (W.D. Mich. Dec. 19, 2018).   Housing Unit staff inspect the yard for security and search prisoners for contraband prior to going out to yard.  (ECF No. 54-12, PageID.434 (MBP OP 04.05.120B Segregation Yard).)   Staff shall use "[e]xtreme caution . . . when searching prisoners leaving their [segregation] cells for contraband items or possible weapons. . ."  (*Id.*)   Thus, the undersigned respectfully recommends that the Court dismiss Kelly's claim that the routine pat-down search, required by prison procedure for segregation prisoners going to the yard, was adverse conduct.

#### 2.  Assault

In *Yates* the Court recognized that a threat of force can qualify as adverse action.   *Yates*, 2018 WL 6629366 at * 6.   Certainly, allegations regarding the excessive use of force can qualify as adverse conduct.   Kelly alleges that LaBelle used force against him in retaliation for the complaints that his family members made about LaBelle and other officers.   Thus, Kelly's claim that the alleged assault against him qualifies as an adverse action is valid.

### c. Causal Nexus

To prevail on a retaliation claim, retaliatory motive "must be a 'but-for' cause [of the injury], meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019). The Sixth Circuit employs a burden-shifting approach with regards to the causal requirement:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X*, 175 F.3d at 399.

The evidence supports Defendant LaBelle's actions in using force against Kelly. First, as explained above, LaBelle was required to conduct a pat-down search before Kelly went to the segregation yard. (ECF No. 54-13, PageID.435 (MBP OP 04.05.120B Segregation Yard).) The video evidence shows that Kelly failed to comply with LaBelle's order to return to his cell and instead turned and moved toward LaBelle apparently to confront him about the order to conduct a pat-down search. Under these circumstances, LaBelle was justified in using force to gain control of Kelly. Kelly admits that he resisted and fought back and he can be heard in the video with sound that he "flipped" LaBelle. Kelly has failed to present contradicting evidence into the record or to respond to Defendants' motion for summary judgment. In the opinion of the undersigned, LaBelle has shown that no genuine issue of fact

exists with respect to Kelly's retaliation claims.   According, pursuant to Rule 56, LaBelle is entitled to summary judgment.

### IV.  Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'"   *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   The analysis entails a two-step inquiry.   *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right."   *Id.*   (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."   *Id.* (citing *Pearson*, 555 U.S. at 232).   A court may address these steps in any order.   *Id.* (citing *Pearson*, 555 U.S. at 236).   A government official is entitled to qualified immunity if either step of the analysis is not satisfied.   *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id*., at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation

omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018).  In the opinion of the undersigned, Defendant LaBelle is entitled to qualified immunity because, based on the evidence before the Court, the force used was a justifiable response to Kelly's refusal to return to his cell and his action of turning toward the officers to confront them.

## V.  Recommendation

It is respectfully recommended that the Court grant Defendant's motion for summary judgment and dismiss this case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    December 2, 2022                   /s/ *Maarten Vermaat*
                                             MAARTEN VERMAAT
                                             U.S. MAGISTRATE JUDGE